Filed 8/17/15  In re Marcus O. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re MARCUS O., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>MARCUS O.,<br><br>        Defendant and Appellant. | F070022<br><br>(Super. Ct. No. 513480)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Valli Israels, Judge.

Candice L. Christensen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Gregory B. Wagner, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

[*]Before Hill, P.J., Kane, J., and Smith, J.

Marcus O., a minor, was found by the juvenile court to have fired a gun at a dwelling. While out on probation after serving time in juvenile hall for this offense, Marcus went to the home of another minor and again fired a gun. After a contested hearing, the juvenile court found that Marcus violated the terms of his probation and committed him to the Department of Juvenile Justice (DJJ). Marcus now argues that the juvenile court abused its discretion by refusing his request for commitment to a less-restrictive setting. We affirm.

## FACTS AND PROCEDURAL HISTORY

On November 26, 2013, the district attorney filed a juvenile wardship petition pursuant to Welfare and Institutions Code section 602, subdivision (a), alleging that Marcus committed three offenses on November 23, 2013, when he was 16 years old: (1) discharging a firearm at an inhabited dwelling (Pen. Code,[1] § 246); (2) possessing a concealable weapon without written permission of his parent or guardian (§ 29610); and (3) resisting arrest (§ 148, subd. (a)(1)). At the pretrial hearing, Marcus pleaded no contest to count 1. Counts 2 and 3 were dismissed.

The probation officer prepared a dispositional social study. The report stated that in the early morning of November 23, 2013, residents of a house in Modesto called the police to report that a shot had been fired through their window from a green car. Officers found a car matching the description given and pulled it over. Marcus emerged from the front passenger door and fled, dropping a nine-millimeter handgun as he ran. A nine-millimeter shell casing was found in the street in front of the house. There were bullet holes in a window and a back wall of the house. A pregnant woman had been sleeping near the window. Rudy Luna, a resident of the house, was standing on the front porch when the green car first passed the house. The shot was fired when the car

---

[1]Subsequent statutory references are to the Penal Code unless otherwise noted.

2.

returned after Luna went back inside. Luna said he was once an active Norteño gang member but was no longer involved in gang activity.

Marcus told the probation officer he was an associate of a Norteño street gang. He admitted the shooting occurred and he was present. "[I]t looked like [one of the residents] flipped me off, but I don't know…. That's when the shooting happened," he said.

Marcus denied he had a substance-abuse problem but claimed he smoked marijuana daily and drank 30 beers and one or two bottles of liquor each weekend. Marcus's father was incarcerated. Marcus had twice run away from home, most recently because he was upset about his father's incarceration. Marcus went to his grandmother's house when he ran away, according to his mother.

Before his detention, Marcus lived with his mother, who had a conviction for driving with an excessive blood alcohol level. Marcus's mother told the probation officer she "believes the minor is responsible within the community and does not require supervision." She did not believe Marcus associated with a gang. She had no knowledge of alcohol use by Marcus and had never seen him under the influence of drugs, but she suspected he had "experimented" with drugs. She thought he got average grades.

The probation officer believed Marcus did not appear remorseful. The officer stated that Marcus failed to acknowledge the seriousness of the crime, expressed no concern for the safety of the victims, and also appeared not to respect the law, his parents, or the property of others. The probation officer recommended confinement in juvenile hall, however—not DJJ—because of Marcus's lack of a prior criminal history.

At the disposition hearing, the probation officer recommended that the period of juvenile hall confinement be 120 days. The court, however, believed this was insufficient in light of the dangerousness of the offense and imposed a term of 240 days. The court stated that it considered a commitment to DJJ, but decided against it. After being released, Marcus was to be on probation in the custody of his mother. The terms of

probation included a requirement to obey the law and a prohibition on possessing firearms.

Marcus was released from juvenile hall on April 13, 2014. On May 27, 2014, he was arrested for violating the terms of his probation. The detention report prepared by the probation officer stated that on May 22, 2014, the mother of a former friend of Marcus reported that Marcus and two other males appeared at her apartment complex. Marcus and the former friend argued, and then the former friend ran toward his apartment. Marcus and his two associates got in a car. Marcus pointed a handgun out of the window and fired it. No one was hit. The car sped away.

Marcus was charged with violating probation by failing to obey the law and by possessing a firearm. Marcus denied the charges and a contested probation violation hearing was held.

At the hearing, the prosecutor explained that he was proceeding by way of a probation violation, not an allegation of a new criminal offense, because of the nature of the evidence. He believed the testimony would show no more than a negligent discharge of a firearm.

Yvette D. testified that she was standing in the parking lot of her apartment complex in Ceres around 7:00 p.m. on May 22, 2014, when she saw Marcus and another person approach her son. She was well acquainted with Marcus because he and her son were once involved in the same gang, and Marcus came to her house often for a number of years. The boys began yelling, and Yvette's daughter shouted for her. Yvette ran to see what was happening. Marcus and his companion ran to a car and got in. A third person was in the driver's seat. Marcus, in the rear passenger seat, pointed a gun out the window and fired once. The gun was pointed toward the complex's pool when Marcus fired. Yvette called the police, who found one .22-caliber shell casing on the ground.

Marcus's mother, Jessica O., testified that on May 22, 2014, she returned from work around 7:00 p.m. and picked up Marcus at a friend's house in Ceres to take him out

4.

for dinner. At 7:08 p.m., Jessica sent a text message to the friend to say she had arrived and Marcus should come out. Marcus and Jessica drove to a restaurant in Modesto, ate dinner, and went home.

Officer Derek Perry of the Ceres Police Department testified that the report of the shooting was called in at 7:06 p.m. on May 22, 2014. Jessica gave him a receipt from the restaurant to which she had taken Marcus. The time stamp on the receipt was 7:14 p.m. Perry spoke to the owner of the restaurant, who said the cash register time stamp was behind by about an hour and five minutes. Perry also watched surveillance video from the restaurant. Marcus and Jessica first appeared in the video about 20 to 30 minutes after the shooting was reported. The officer said that, without traffic congestion, the drive from Ceres to the restaurant in Modesto would take around seven minutes.

After saying the case was "a very close call," the juvenile court found by a preponderance of the evidence that Marcus violated his probation. It concluded that Marcus failed to obey the law and was in possession of a firearm.

The probation officer prepared a second dispositional social study and filed it on June 27, 2014. Marcus told the probation officer he was not present at the shooting on May 22, 2014. He admitted he was still a Norteño gang associate. He said he smoked marijuana two or three times per day and drank beer on weekends. Marcus's mother again denied to the probation officer that she was aware of any drug or alcohol use by Marcus and still did not believe he was affiliated with a gang.

The social study reported that on November 24, 2013—the day after the first shooting—Marcus got in a fight with another minor at juvenile hall. Marcus was the primary aggressor. The other party to the fight was Enrique D., the son of Yvette D. During the incident, other minors yelled "snitch" and "drop out" at Enrique.

The study also reported that on January 22, 2014, a corrections officer saw Marcus spitting on the door of two other minors' room. The probation officer believed this

incident, like the in-custody fight with Enrique, illustrated Marcus's "issues in regards to minors not seen [to be] in good standing with the [Norteño] criminal street gang."

The study concluded that Marcus should be committed to DJJ. The probation officer believed Marcus "intended to seriously injure or kill the intended victims of both" shootings. He pointed out that Marcus had been out of custody only 41 days when he committed the second shooting. He opined that Marcus's pattern of violence would continue without "lengthy and intensive treatment," including gang-intervention treatment. The probation officer wrote that DJJ had treatment programs of this kind that were not available in juvenile hall or group homes.

According to an incident report prepared after the dispositional social study was filed, Marcus got in another fight at juvenile hall on June 28, 2014. Marcus and another minor challenged each other and began exchanging punches. The two boys continued fighting as they were ordered to desist and then pepper sprayed. The fight ended when correctional officers seized them.

At the dispositional hearing, Jessica testified that Marcus behaved well after he was released and before the second shooting. He did not miss school, did his chores, and obeyed her. She said she was willing to take steps to become educated about gangs and how to prevent gang involvement. She had moved from Modesto to San Jose to help Marcus escape negative influences.

Marcus also testified that he was doing well after he was released. He was attending school, not missing classes, getting better grades, and catching up on his course credits so he could graduate on time. He had a job attending a photo booth. He claimed he had "stopped associating with the people I used to associate with." He had participated in programs that helped him learn to control his anger and think about the consequences of his actions. He hoped he could be placed on electronic monitoring, in a group home, or in juvenile hall, and not be sent to DJJ.

Marcus's grade point average during the time after he was released was 3.18. While in custody after the second shooting, and before the last fight, he received an honor roll certificate. According to the result of an assessment, a report of which was attached to the probation officer's report, Marcus's risk level for reoffending was moderate. This report further stated that no service needs had been identified for Marcus.

Marcus's counsel argued that DJJ had a high recidivism rate and would likely lead to a long-term cycle of being in and out of custody. Further, the change from juvenile hall to DJJ would be "a huge jump." Counsel argued for a group-home placement. She said Marcus would benefit from role models and counseling in such a placement and would have a better chance of success.

The trial court agreed with the probation officer's recommendation of a commitment to DJJ. In explaining its ruling, the court emphasized several factors. It pointed out that the original offense is listed in Welfare and Institutions Code section 707, subdivision (b), and that Marcus therefore could have been prosecuted as an adult under subdivision (c). Both the original offense and the probation violation involved Marcus firing a gun. After the original offense, the probation officer and the juvenile court considered a DJJ commitment, and the juvenile court gave Marcus more time in juvenile hall than the probation officer recommended. In spite of the extra time, Marcus reoffended soon after his release While in juvenile hall, Marcus was involved in fighting. In the most recent incident, Marcus had disobeyed an order to stop fighting even after he had been pepper sprayed. In her recent statements to the probation officer, Marcus's mother continued to report that she had no awareness of Marcus's drinking, drug use, and gang involvement.

All these facts indicated that a home commitment with electronic monitoring and another juvenile hall commitment would both be inadequate responses to Marcus's behavior. Further, in a group home, "there's not as much supervision" as in a more restrictive setting, and "[p]eople can come and go more as they please."

7.

The court found that placements in juvenile hall and on probation in his mother's custody had failed; that all reasonable efforts had been made to prevent removal from the home; that all reasonable alternatives had been considered; and that a DJJ commitment would benefit Marcus and was in his best interest. He needed intense supervision in a secure facility. It was probable that he would benefit from the reformatory, education, and treatment resources at DJJ. The court also stated that a DJJ commitment was appropriate to hold Marcus accountable and to protect the community. It committed Marcus to DJJ with a maximum confinement time of 84 months

## *DISCUSSION*

Marcus challenges the juvenile court's decision to commit him to DJJ. In determining whether the juvenile court acted within its discretion in making its commitment decision, we indulge all reasonable inferences supporting the decision; we do not substitute our own judgment about which placement would be best; and we reverse only if the juvenile court's action exceeds the bounds of reason. (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; *In re Khamphouy S.* (1993) 12 Cal.App.4th 1130, 1135.) We can affirm, however, only if the record contains evidence showing that there is a probable benefit to Marcus from the discipline and treatment available at DJJ and that less-restrictive alternatives would be ineffective or inappropriate. (Welf. & Inst. Code, § 734; *In re Angela M., supra*, at p. 1396.) Public safety, the need to hold the minor accountable for his behavior, the circumstances and gravity of the offense, the minor's previous delinquent history, and the minor's age are all proper factors for the juvenile court to consider; and there is no requirement that a commitment to a less-restrictive placement be tried before a DJJ commitment can be imposed. (Welf. & Inst. Code, §§ 202, subds. (a), (b), 725.5; *In re Jimmy P.* (1996) 50 Cal.App.4th 1679, 1684; *In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.)

The court did not abuse its discretion. There was ample evidence that less-restrictive alternatives were ineffective. Juvenile hall and probation in parental custody

8.

had proved inadequate as Marcus reoffended while on probation in his mother's custody weeks after his release from a significant period in juvenile hall. The court could reasonably find that a group-home commitment would have little chance of greater success, since Marcus would have the ability to continue committing dangerous offenses in the community if living in a group home. Also, his fighting and other misbehavior in juvenile hall provided scant grounds for confidence about his conduct toward other minors in the less-secure environment of a group home.

There also was substantial evidence that Marcus would probably benefit from a DJJ commitment. The probation officer wrote that Marcus's violent behavior called for treatment, including gang-intervention treatment, that was not available in other settings. Further, DJJ's locked environment could reasonably be found to constitute a benefit, since Marcus had a record of resorting to firearms to cope with problems when free in the community. Preventing this behavior benefits Marcus as well as the community.

Marcus argues that the probation officer did not consider a group-home placement. The question, however, is not what the probation officer considered but whether the evidence supports the ruling. Marcus also mentions several factors that, in his view, weighed in favor of a different disposition: an assessment rated the likelihood he would reoffend as moderate; the same assessment identified no service needs for him; Marcus said he was motivated to change his behavior; he had completed 85 out of 200 course credits needed to finish high school; he could potentially stay in a group home until he is 20, not just until he is 18; DJJ's population represents only a small portion of the juvenile wards in California, those with the most intensive needs; and the DJJ commitment will undermine Marcus's family relationships because DJJ's facilities are distant from his mother's home. These were all factors the court could consider, but the question on appeal is whether, in light of the evidence, the juvenile court's decision was within the bounds of reason, not whether there were any factors that could have supported a different decision.

9.

## *<u>DISPOSITION</u>*

The judgment is affirmed.